# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
May 19, 2009 Session

## STATE OF TENNESSEE v. TEDDY RAY MITCHELL

**Appeal from the Criminal Court for Hamblen County**
**No. 06CR464    John Dugger, Jr., Judge**

---

**No. E2008-02672-CCA-R3-CD - Filed March 31, 2010**

---

The Defendant, Teddy Ray Mitchell, appeals from his jury conviction in the Criminal Court of Hamblen County for disorderly conduct, a Class C misdemeanor, for which he received a sentence of thirty days in jail. In this appeal as of right, the Defendant contends (1) that the evidence is insufficient to support his conviction, (2) that his conviction violates his First Amendment right to free speech, and (3) that the trial court erred in admitting evidence of an altercation with another police officer that was contemporaneous to the offense. Following our review, we conclude that the evidence is insufficient to support the Defendant's conviction of disorderly conduct. Accordingly, the Defendant's conviction is reversed, and the case is dismissed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is**
**Reversed and Dismissed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined. NORMA MCGEE OGLE, J., filed a separate dissenting opinion.

Darren V. Berg; James C. Wright; and R. Deno Cole, Knoxville, Tennessee, attorneys for appellant, Teddy Ray Mitchell.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; C. Berkeley Bell, District Attorney General; and Victor J. Vaughn, Assistant District Attorney General, attorneys for appellee, State of Tennessee.

**OPINION**

The events giving rise to the Defendant's arrest involve his attendance at an anti-illegal immigration rally held on June 24, 2006 on the grounds of the Hamblen County Courthouse. Morristown Police Department personnel were present at the scene for the purpose of controlling the crowd and ensuring that no one entered the rally site with any weapons. Included in the safety restrictions was the prohibition against carrying an American flag attached to any pole or stick. When the Defendant was confronted at the rally entrance by officers about his standard-size flag and flagpole, a verbal altercation and physical confrontation occurred between the Defendant and several officers that ultimately led to the Defendant's arrest for disorderly conduct and resisting arrest.

Andre Kyle, a patrol officer with the Morristown Police Department, testified that he was the first officer to encounter the Defendant at the rally. He recalled that when the Defendant attempted to park his car along the shoulder near the sidewalk, a prohibited area for security reasons, the Defendant told Officer Kyle, "There's no n****r going to tell me where I can and can't park." After Officer Kyle called for assistance, Officer Matt Stuart arrived and told the Defendant that he could not park along the sidewalk. Officer Kyle stated that the Defendant then "got irate and mad and he sped off." Officer Kyle recalled that the Defendant eventually parked "up the road . . . where he wasn't supposed to be parked" but where no officer was present to ask him to move. Officer Kyle stated, upon exiting his vehicle, that the Defendant "made a b-line toward the gate."

Officer Kyle testified that the Defendant approached the gate with flag in hand and that an officer immediately told him that he could carry the flag, but not the flagpole, into the rally. The Defendant began yelling and screaming. Officer Kyle testified that while officers attempted to arrest the Defendant, the Defendant shook the flag up and down toward the officers and poked Officer Troy Wallen. Officer Kyle testified that it took a struggle to subdue the Defendant and place him under arrest. Officer Kyle stated that he was accidentally tasered by another officer during the struggle. He also opined that "when you cause a scene in public you are disorderly."

Officer Matt Stuart of the Morristown Police Department testified regarding his initial encounter with the Defendant on the day of the rally. He recalled that he went to Officer Kyle's assistance and described the Defendant as "real belligerent, real irate, made some remarks, talked about how he fought for this country, wanted to know who says he could not park there . . . . He made some derogatory comments about the chief [of police] . . . and parked at another illegal spot." Officer Stuart recalled that no one was allowed into the rally with a flagpole or poster stick or anything else that could be used a weapon. He recalled that everyone had complied without objection with the safety requests except the Defendant.

-2-

When he told the Defendant that he would need to remove the flag from its pole, the Defendant began screaming. Officer Stuart testified that they received a radio call to remove the Defendant from the area because he was causing a scene at the gate entrance and the police personnel were concerned that a riot could occur.

On cross-examination, Officer Stuart conceded that one of the rally organizers was permitted to carry a flag attached to a pole into the rally for placement at the speakers podium, an area that was separate from the general rally area. Officer Stuart stated that the Defendant "tensed up" when he attempted to place him under arrest. Officer Stuart also conceded that the Defendant did not fight with the flagpole until after Officer Stuart attempted to place the Defendant under arrest. Officer Stuart testified that the Defendant cursed loudly from his car and also cursed at the gate entrance. When asked about whether the use of a taser was appropriate when someone is "simply questioning whether he could bring his flag in," Officer Stuart replied

> It could be. Not pertaining to just carrying a flag. Like I told you once before, it's not an issue of carrying a flag in, the issue was it was a simple request. Everyone else there [did] it. There w[ere] a lot of people there at the rally. Simply remove the pole, take it back to your car and you can bring your flag in. That's all he had to do.

Officer David Hancock and Detective Chris Blair, both of the Morristown Police Department, testified consistently with the other officers regarding the Defendant's demeanor when approaching the gate entrance and the general commotion caused when he refused to remove his flag from the flagpole. Detective Blair testified that he was responsible for screening people for weapons as they entered the rally and that he had to close the entrance for a brief period of time while the other officers handled the struggle with the Defendant in order to insure that the incident did not escalate into involvement of other citizens at the rally.

Morristown Police Department Officer Troy Wallen testified that the Defendant approached the gate and "began to rant and rave over not being able to bring his flag in." Officer Wallen attempted to explain to the Defendant that he could bring the flag but had to remove it from the flagpole. He testified that the Defendant "continu[ed] to rant and rave about this, he had the flagpole in his hands. Where I was standing at the flagpole, he was shaking it up and down as he was ranting and the flagpole, at that point, had come in contact with me two or three times." When officers began to arrest the Defendant, Officer Wallen grabbed the flagpole to prevent the Defendant from striking anyone with it. He recalled that the Defendant complained about the unfairness that others could bring in Mexican flags but he was forbidden from bringing in an American flag to which Officer Wallen recalled, "I explained to him on more than once that he could bring his flag in, that he could just not

bring his flagpole in." Notably, Officer Wallen stated that the Defendant poked him with the flagpole several times prior to the officers attempting place the Defendant under arrest. Officer Wallen admitted that he and the other officers surrounded the Defendant soon after he approached the gate but explained that they did so because the Defendant was attempting to enter the rally without removing the flag from the flagpole. He also recalled that the Defendant used foul language as he argued loudly with the officers throughout the incident.

Frankie Lane testified that he was a part-time officer with the Morristown Police Department at the time of the rally. He recalled coming to the assistance of the other officers as they attempted to place the Defendant under arrest. He admitted that he attempted "to give a drive stun" with a taser to the Defendant in an effort to subdue him. He explained that a taser is used whenever a person "becomes actively aggressive towards officers or anyone. If you think they are fixing to use hands or feet to become physically combative . . . ." He further testified on cross-examination that he attempted to use the taser because the Defendant was pushing an officer. He also stated that he did not know whether he touched the Defendant with the taser and that he put it away when the struggle with the officers escalated to the point that the use of the taser was unsafe.

Chris Weisgarber, a lieutenant training officer and SWAT team commander for the Morristown Police Department, testified that he was responsible for planning and coordinating officers for the rally. As part of his duties, he briefed the officers regarding safety measures and restricted items at the rally. He admitted that one of the rally organizers was allowed to carry a flag attached to a flagpole to the speaker's podium but explained that the speaker's podium "was controlled even more than the regular participants" area. He also explained that the restriction regarding poles and sticks was developed from anti-terrorism briefings that the officers attended which instructed them that people often carry weapons such as knifes hidden within poles or attached to sticks. He recalled that he noticed the Defendant was at the main entrance "creating a scene" so he radioed the officers and instructed them to remove the Defendant from the area. A video recording of the incident was also presented at trial.

The Defendant presented the testimony of several witnesses who testified that they attended the rally that day. Patricia Stephens described the presence of law enforcement officers as "just terrifying" yet she elected to stay at the rally. She also stated that "it was upsetting that no one could enter with a flag on a pole or even on a little tiny stick" as she was asked to remove her small flags from their sticks prior to entering the rally. She admitted that the Defendant was upset and used a loud voice but denied that he cursed the officers or acted threateningly in any way. She reported that she was so upset after the incident that she "cried and cried all day." Tom Lowe, a guest speaker at the rally, testified regarding what he described as the rather large presence of law enforcement. He was

surprised to see officers dressed in riot gear and snipers on area roof tops. He opined that the large presence was an effort to "quieten [sic] us down." Audrey Lowe testified that she witnessed one officer snap a flag stick while telling a lady that she could not carry it in on the stick. She denied seeing the Defendant fighting with anyone or using obscenities at any time.

The State called Lieutenant Weisgarber as a rebuttal witness who admitted that security was increased in anticipation of any violence that may ensue from either side of the immigration issue. Based upon the evidence presented, the jury convicted the Defendant of disorderly conduct but acquitted him of resisting arrest.

## ANALYSIS

### Sufficiency of the Evidence

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Tennessee Code Annotated section 39-17-305(a)(1) provides, in relevant part, that "[a] person commits [disorderly conduct] who, in a public place with the intent to cause public annoyance or alarm, engages in . . . threatening behavior." In State v. Creasy, 885 S.W.2d 829 (Tenn. Crim. App. 1994), our court found sufficient proof that the defendant engaged in "threatening behavior" based upon evidence that the defendant, with a clenched fist and finger-pointing, directed profane and insulting language toward a police officer who was ticketing the defendant's car for a parking violation. Of note, this court reaffirmed the standard first enunciated in Garvey v. State, 537 S.W.2d 709 (Tenn. Crim. App. 1975) that

police officers are held to a different standard than the ordinary citizen when evaluating insulting words. Creasy, 885 S.W.2d at 831. In Garvey, this court reasoned that the use of threatening language in a disorderly conduct case involving a police officer should be examined under a heightened standard because law enforcement officers are "trained to exercise a higher degree of restraint than the average citizen." Garvey, 537 S.W.2d at 711 (evidence insufficient where defendant called police officer "sooey" while passing officer on the street). We concluded that sufficient evidence was presented in Creasy because the defendant not only directed profanity at the officer but also positioned himself between the officer and his vehicle, clenched his fist, and pointed his finger at the officer while the officer issued the ticket. Creasy, 885 S.W.2d at 832. With these principles in mind, we now turn to the evidence presented in this case.

The testimony at trial indicates that the Defendant, whom witnesses described as "irate and mad" after his initial confrontation with officers regarding parking, approached the rally gate and immediately began yelling and screaming when officers told him that he could not take his flagpole into the rally. Officer Wallen testified that the Defendant struck him several times with the flagpole during the incident. Officer Stuart testified that the Defendant did not begin to "fight with the stick" until Officer Stuart grabbed the Defendant's arm to arrest him. The Defendant was, as noted previously, acquitted of resisting arrest. Part-time Officer Frankie Lane testified that he attempted to use a taser on the Defendant and that he had been trained to use a taser only when someone is "fixing to use hands or feet to become physically combative"(behavior which, without question, would be threatening).

However, the video recording of the incident belies the officers' testimony in very significant ways. Although it appears that throughout the entire incident the Defendant's voice is raised and he is belligerently arguing with the officers about his right to carry the flag into the rally, the officers did not testify to any specific verbal threats made by the Defendant during the incident. Likewise, no testimony that the officers felt threatened by the Defendant appears in the record. Furthermore, the video does not show the Defendant shaking the flag up and down and striking Officer Wallen in the chest with the flagpole two or three times, or at all, as testified to by Officer Wallen. Indeed, the flagpole appeared to only raise slightly from its downward position once Officer Wallen placed his hand on the flagpole in order to arrest the Defendant. The videos are void of any actions of the Defendant that could be deemed physically threatening. We also note that there are neither lapses nor segments in the videos when the Defendant is sufficiently out of view during which time the Defendant may have accosted Officer Wallen with the flagpole. Therefore, we conclude that the evidence is insufficient to support the Defendant's conviction of disorderly conduct. Having so concluded, it is unnecessary to address the Defendant's remaining allegations attacking the constitutionality of the statute's application to the facts of this case and the alleged erroneous admission of evidence.

CONCLUSION

Following our review, we conclude that there is insufficient evidence to support the Defendant's conviction for disorderly conduct. Accordingly, the judgment of the trial court is reversed and the case is dismissed.

_____
D. KELLY THOMAS, JR., JUDGE